# In the United States Court of Federal Claims

No. 16-687C
Filed: December 20, 2016

|  |  |  |
|---|---|---|
| ASI CONSTRUCTORS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Keywords: Subject Matter Jurisdiction; |
| v. | ) | Contract Disputes Act; Differing Site |
| | ) | Conditions; Misrepresentation; Covenant |
| THE UNITED STATES OF AMERICA, | ) | of Good Faith and Fair Dealing; Breach of |
| | ) | Contract. |
| Defendant. | ) | |
| | ) | |

*Milton L. Smith*, Sherman & Howard, LLC, Colorado Springs, CO, for Plaintiff.

*Christopher L. Harlow*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were *Allison Kidd-Miller*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, for Defendant. *Lauren M. Williams*, Assistant District Counsel, Office of Counsel, US Army Corps of Engineers, Of Counsel.

## OPINION AND ORDER

**KAPLAN, Judge.**

The U.S. Army Corps of Engineers (the Corps) awarded Plaintiff ASI Constructors, Inc. (ASI) a contract to perform certain construction work at the Canton Lake Dam in Oklahoma. According to ASI, after it began the work it encountered unexpected conditions that adversely impacted its performance, resulting in cost increases and time delays.

In its complaint before this Court, ASI claims entitlement to an equitable adjustment of the contract based on Type I differing site conditions.[1] It further alleges that the Corps breached the contract by failing to disclose material information regarding site conditions about which it had superior knowledge; that the Corps misrepresented material facts related to site conditions; and that it breached the duty of good faith and fair dealing in its administration of the contract. Finally, ASI claims that the Corps engaged in constructive acceleration of ASI's performance by refusing to grant ASI's reasonable requests for additional time and by withholding progress

---

[1] A Type I differing site condition refers to subsection one of 48 C.F.R. § 52.236-2(a), which provides the framework for addressing when a contractor encounters "subsurface or latent physical conditions at the site which differ materially from those indicated" in the contract. Id.; see also Int'l Tech. Corp. v. Winter, 523 F.3d 1341, 1348–49 (Fed. Cir. 2008).

payments to ASI. It seeks damages for breach of contract to compensate for the increased costs that it claims it incurred as a result of the Corps' wrongful actions.

The government has moved to dismiss ASI's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims (RCFC). It contends that the Court lacks jurisdiction over ASI's superior knowledge and duty of good faith and fair dealing claims because ASI failed to present them to the contracting officer (CO) as required by the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–09. It further argues that ASI has failed to state a claim for differing site conditions because the contract documents did not make affirmative representations about the conditions at issue. Similarly, the government contends that ASI has failed to state a superior knowledge claim because the specifications the government provided to ASI were not misleading. Finally, the government contends that the remainder of ASI's claims are redundant and derivative of ASI's differing site condition and superior knowledge claims, and hence should also be dismissed.

For the reasons discussed below, the government's motion to dismiss is **DENIED**.

## BACKGROUND[2]

### I.    The Canton Lake Dam Project—Phase I

The Canton Lake Dam is located seventy-five miles northwest of Oklahoma City, Oklahoma. Compl. ¶ 6. The dam was originally constructed in 1948. Id. At some point prior to 2008, the Corps determined that the dam's concrete spillway was at risk of "sliding" during a flood and that it also lacked adequate capacity. See id. ¶¶ 6–7. To address these issues, the Corps proposed a two-phase project to stabilize the spillway and construct an emergency auxiliary spillway. Id. ¶ 6.

A contract to perform Phase I of the project was awarded to Nicholson Construction Company (Nicholson) in September 2008. Id. ¶¶ 6–7. Under the contract, Nicholson was to excavate the new auxiliary spillway channel, build diaphragm walls on the north and south sides

---

[2] The facts in this section are based upon the allegations in ASI's complaint, which the Court assumes to be true for purposes of deciding the motion to dismiss, and on jurisdictional facts found in the documents attached to the parties' motions. In deciding the government's motion to dismiss, the Court may consider "documents incorporated into the complaint by reference," as well as the contract provisions appended to the government's motion to dismiss. See Bristol Bay Area Health Corp. v. United States, 110 Fed. Cl. 251, 261–62 (2013) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)) (holding that where contract documents were central to the plaintiff's allegations and referenced in the complaint, and where plaintiff did not dispute their authenticity, the court could consider them without converting a Rule 12(b)(6) motion to dismiss into one for summary judgment); see also RCFC 9(k) & 10(c) (a party "pleading a claim founded on a contract" may "annex to the complaint a copy of the contract" which is then a "part of the pleading for all purposes").

of the channel, and install "riprap" along the embankment. Id. ¶ 7. Nicholson began work on the contract in October 2008 and completed its work in January 2011. Id.

According to ASI, Nicholson encountered high groundwater conditions in the spillway channel and on the south slope of the channel during construction. Id. ¶ 21. Nicholson advised the Corps that the "flowing groundwater" it encountered represented a differing site condition (DSC) because the contract documents had described the groundwater as "perched" rather than flowing. Id. ¶ 22. Nicholson eventually submitted a claim to the Corps for a DSC based upon the "spring-like" condition on the south slope of the channel. Id. ¶ 25. That claim was initially denied by the Corps but then ultimately settled in mediation. Id. ASI alleges "upon information and belief" that the Corps "acknowledged the existence of DSCs in its settlement with Nicholson." Id.

## II.  Contract Award to ASI to Perform Phase II of the Project

The Corps issued a request for proposals for Phase II of the project in May 2011. Id. ¶ 10. The solicitation included project specifications and a 212-page Engineer Research and Development Center Report (the ERDC Report). That report contained a description of the site conditions and the results of geotechnical testing conducted at the site by the Corps and various contractors. See id. Its stated purpose was "to share insights into site geology, water table information, [and] select laboratory and field instrumentation and field data considered relevant to the design of the new shoring system at the site of the weir." Def.'s Mot. to Dismiss App. (Def.'s App.) at DA043.

Phase II required the construction of "a concrete weir,[3] nine fusegates[,] and concrete aprons[4] immediately upstream and downstream of the weir." Compl. ¶ 8. The contractor would be required to excavate thirty-five feet below the diaphragm walls and insert tieback anchors into the south diaphragm wall as part of the construction process. Id. ¶ 9. Tieback anchors are drilled, grouted, and "post-tensioned" to provide lateral support to stabilize slopes. Id. According to ASI, "[e]xtensive temporary shoring also had to be placed below the north and south diaphragm walls at the weir excavation and the shoring also required tieback anchors." Id. Further, "[c]onstruction of the weir could not start until the temporary shoring systems had been designed and installed." Id.

ASI alleges "the Corps failed to disclose vital knowledge of site conditions gained during both the Spillway Stabilization Program and the Phase I construction." Id. ¶ 11. It asserts that "[b]ecause Phase II was to be constructed on the same site and involved excavation and associated work far deeper than that performed in Phase I, knowledge of the subsurface conditions experienced in the Spillway Stabilization Program and Phase I would have been important to any Phase II offeror." Id. In fact, ASI alleges, "[d]uring the Phase II bidding process, the Corps was specifically asked by an offeror about 'unforeseen conditions or

---

[3] A weir is a "low dam built across a body of water." Compl. ¶ 8.

[4] Concrete aprons "are designed to prevent erosion from water flow." Id.

difficulties encountered' in Phase I" and "[t]he Corps refused to provide the Phase I Downstream Apron DSC Knowledge." Id. ¶ 14.[5]

ASI submitted a proposal for the Phase II contract in July 2011. Id. ¶ 15. In preparing its proposal, ASI relied upon the solicitation and the ERDC Report, including the data for soil and rock strata contained in the ERDC Report. See id. ¶¶ 15–17. ASI's proposal was "specifically conditioned" on the assumption that the geotechnical information in the ERDC Report represented actual site conditions. Id. ¶ 17.

On September 16, 2011, the Corps awarded the Phase II contract to ASI. Id. ¶ 18. On October 25, 2011, the Corps issued a notice to proceed. Id.

## III.   ASI's Differing Site Condition Claims

After the Corps issued the notice to proceed, ASI subcontracted with Schnabel Engineering (Schnabel) to design the shoring and dewatering systems, Russo Corporation (Russo) to install the tieback anchors for the shoring, and the Judy Company to install the downstream apron anchors for the concrete apron just downstream of the spillway. Id.

During performance of the contract, ASI alleges that it encountered four DSCs. Id. ¶ 19. While the Corps provided equitable adjustments to the contract for two of the alleged DSCs (described below in subsections A and B), it denied them for two others. It is the latter two (described in greater detail in subsections C and D below) which form the central basis for ASI's claims in this case.

### A.   Changed Soil Parameters Resulting in Bilateral Modification

ASI alleges that the first DSC arose during the design portion of Phase II. See id. ¶ 32. Thus, while designing the shoring system for the diaphragm wall, the design subcontractor, Schnabel, created a computer model based on the soil parameters in the contract specifications. Id. The model indicated that the diaphragm walls constructed during Phase I were unstable. Id.

---

[5] The information the Corps allegedly withheld included: 1) an April 30, 2010 notice of DSCs from Nicholson to the Corps "advising of 'high groundwater conditions in the channel and on the south slope of the channel' and [that] 'material at the base of the channel is not rock'"; 2) "a May 14, 2010 letter from the Corps to Nicholson denying the existence of a DSC and asserting such conditions should have been anticipated"; 3) a letter from Nicholson to the Corps dated May 26, 2010 which provided "further information including a geotechnical analysis of the area at issue establishing 'high groundwater' conditions"; 4) a November 18, 2010 email from the Corps to Nicholson "to modify certain work based on 'what our Geotech wants,' which Nicholson believed was a direct result of DSCs due to unforeseen continuous inflow of water"; 5) a letter dated March 28, 2011, from Nicholson to the Corps "regarding 'Channel Bottom Differing Site Conditions' and seeking a written determination from the CO"; 6) an April 14, 2011 letter from the Corps "finding no DSC, without further discussion"; and 7) "[a]n October 19, 2011 claim filed by Nicholson for 'Channel Excavation Differing Site Conditions' due to 'unforeseen continuous inflow of water.'" Id. ¶ 13.

After being notified of this issue, the Corps changed the retained strata parameters in RFP-001, dated January 3, 2012. Id. But while "[a]dditional analysis using the modified parameters showed the existing walls were stable," it also showed that "the intake and conduit areas near the weir were not." See id. ¶ 33. The Corps accordingly changed the soil parameters again in RFP-002, this time for the intake and conduit areas, which "resulted in considerable delay to the design phase." Id. ¶¶ 33–34. To address the delay, on May 23, 2012, the parties agreed to contract modification P0003, which increased the contract price by $825,000 and extended the contract completion date by fifty-five days. Id. ¶ 35.

### B.      Changed Groundwater Conditions Resulting in Unilateral and then Bilateral Modification

ASI alleges that a second DSC was discovered when Schnabel was designing the temporary shoring system for the diaphragm walls. Id. ¶ 36. According to ASI, certain instrumentation installed behind the diaphragm walls as part of a testing program conducted by Schnabel "showed groundwater in the breccia (a type of sedimentary rock), which was materially different from indications in the Solicitation and ERDC Report." Id. "The groundwater conditions," ASI alleges, "caused the excavation to be globally unstable." Id. "The only practical means to mitigate the instability," according to ASI, "was dewatering at a greater depth than required by the Solicitation and the ERDC Report." Id.

On February 4, 2012, ASI notified the Corps of this issue. Id. ¶ 37. It sent the Corps a follow-up letter on February 22, 2012, which included a report prepared by Schnabel "describing material differences between the actual site groundwater conditions and those indicated in the ERDC Report." Id. ¶ 38. On March 13, 2012, the Corps began an investigation. Id. ¶ 39. As a result of the investigation, on May 15, 2012, the Corps changed the shoring design parameters and dewatering specifications. Id. ¶ 40. Because of these changes, the Corps issued modification P0004, which increased the contract price by $1,833,992, and increased the time for completion by 182 days. Id. ¶ 41. ASI and the Corps later agreed to an additional increase in contract price of over $500,000 because of the design changes. Id. ¶ 42.

### C.      Fissured Rock Causing Tieback Anchor Failures

The third DSC ASI allegedly encountered, which is one of the two DSCs at issue in this case, concerns the character of the rock behind the diaphragm walls. See id. ¶¶ 32, 44. As discussed above, Schnabel had designed a shoring system to support the excavation and construction of the weir and other portions of the auxiliary spillway. See Def.'s App. at DA006–07 (contract specifications—scope of work). The installation of tieback anchors into the diaphragm walls was "a critical element of the shoring design." Compl. ¶ 44.

In December 2012, Russo began installing the tieback anchors at the construction site through "open hole and air hammer drilling methods," which were "compatible with the geotechnical conditions described in the Solicitation and ERDC Report, and with industry standards for the described formation." Id. ¶ 45. Once installed, however, several of the tieback anchors failed because the rock into which they were being embedded was "pervasively fissured causing loss of grout and non-uniform grout bond to the tieback." Id. According to ASI, "[g]rout

loss into fissures was not anticipated as the Solicitation and ERDC Report indicated that the fissures were closed and discontinuous." Id.

After discovering the fissures and resulting anchor failures, on February 9, 2013, Russo wrote a letter to ASI stating that "[b]ased on what we are seeing . . . the formation appears to have seams and fissures that we did not anticipate" and that "[c]onsidering the information provided, it is our opinion that there is a variance in site conditions." Id. ¶ 46. Additionally, Russo told ASI that had it "anticipated this condition . . . [it] would have had a much different approach to the drilling and grouting operations." Id.

According to ASI, the "fissured conditions actually encountered differed materially from those indicated in the Contract." Id. ¶ 47. For that reason, in a February 11, 2013 letter, ASI "notified the Corps of the rock fractures, advised the Corps that the impacted activities were on the critical path, and requested an investigation of the DSC." Id. ¶ 48. In its letter, ASI noted that nineteen out of twenty-nine tieback anchors had failed testing. Id.

ASI alleges that during a conference call held on February 11, 2013, the Corps disclosed for the first time that it was aware that there were fissures in the rock behind the diaphragm wall. Id. Further, on February 14, 2013, two of the Corps' engineers prepared a Memorandum for the Record, addressing ASI's February 11, 2013 DSC allegation. Id. ¶ 49. In the memorandum, which was subsequently supplied to ASI and Schnabel, "[t]he Corps engineers indicated the conditions impacting ASI's installation of tieback anchors were similar to conditions prior contractors had encountered at the dam." Id. ASI alleges that "[t]his information had not previously been provided to ASI and was unknown to ASI at the time it submitted its Phase II proposal." Id.

On March 13, 2013, the Corps denied that the fissured rock ASI and its subcontractor had encountered represented a DSC. Id. ¶ 50. About one month later, on April 15, 2013, the Corps gave ASI additional site information which it had not previously provided. Id. ¶ 51. This included an additional ERDC report, which ASI alleges "referenced numerous other prior reports," a "Nicholson Test Anchor Report for Diaphragm Walls," an "undated Design Document Report Spillway Stabilization DDR, Canton Lake Dam Safety Assurance Program Canton Lake, Canton Oklahoma," and "other Spillway Stabilization Program and Phase I information." See id. ASI alleges that the information provided in these documents "addressed serious problems including borehole collapse as well as the need for casings to prevent hole collapse, but these problems were not addressed in the Phase II RFP documents." Id.

According to ASI, "the Spillway Stabilization Report was particularly significant." Id. ¶ 52. It described a 2003 anchor test program performed "immediately adjacent to the Phase II Project." Id. That test program "experienced many of the same anchor problems experienced in Phase II by Russo, including 'hole collapse,' fissures allowing transmission of grout between adjacent anchor holes during anchor construction, and the need to protect instrumentation during anchor testing." Id. ASI alleges that "[t]he knowledge gained during the Spillway Stabilization Program and contained in the Spillway Stabilization Report, particularly the knowledge gained during the 2003 Anchor Test Program about constructability issues, was material and vital to the Phase II tieback anchor installation." Id.

On September 18, 2013, ASI asked the Corps to reconsider its March 13, 2013 denial. It wrote that "[b]ased on information USACE provided ASI after these issues arose, it appears USACE knew about similar conditions at the site," and that "[t]his superior knowledge should have been shared with ASI and other bidders." Id. ¶ 56. Ultimately, ASI finished installing the anchors by changing its drilling methods to use water instead of air. Id. ¶ 58. As a result, anchor installation took more time than ASI originally anticipated. Id. Accordingly, ASI submitted a request for equitable adjustment to the Corps seeking a fifty-day extension and "associated costs." Id. The Corps denied this request. Id.

### D.    Unexpected Water Conditions at the South Slope Apron

The fourth DSC described in ASI's complaint, which is also at issue in this case, concerns groundwater conditions at the downstream apron. See id. ¶ 59. ASI claims that "[t]he spring-like groundwater conditions that impacted Nicholson during Phase I at the downstream channel also impacted ASI during Phase II." Id. According to ASI, the ERDC Report had described a perched water table on the south slope of the downstream apron. Id. ASI alleges that the ERDC Report also indicated that the groundwater was "recharged from the north only and the breccia [was] generally dry." Id. ¶ 60.

"The conditions ASI anticipated based on the perched water table noted in the ERDC Report would have involved minimal water drainage so excavation could be performed in the dry." Id. ¶ 59. But when ASI began excavating for the apron in February 2014, its subcontractor allegedly encountered "a source of flowing water" that was being recharged from the south. Id. ¶ 60. There was also water in the breccia. Id. Additionally, ASI discovered that when it shut down the dewatering system it had used for the shoring wall and the excavation of the weir, the downstream apron "became saturated." Id. ¶¶ 61–62. Therefore, ASI turned the system back on and ran it for the entire time it was working on the south slope apron. Id. ¶ 62.

ASI alleges that the "unexpected discovery of an unconfined groundwater table . . . significantly impacted ASI's ability to dewater prior to excavation." Id. ¶ 59. It further alleges that "[d]espite the major difference between a perched water table that can be drained and an unconfined water table with active water flowing into it, the Corps never acknowledged the impacts of the difference and refused to acknowledge it as a DSC in Phase II." Id.

ASI further claims that the unexpected groundwater conditions "had a major impact on ASI's progress because ASI's Proposal and construction schedule sequenced the work to have the weir precede the Apron." Id. ¶ 63. It states that "[t]hese impacts would have been avoided if the site's groundwater conditions had actually been as represented in the ERDC Report (groundwater flow from the north) because the completed weir would have cut off the recharge of water from the north and prevented groundwater from entering the south slope and Apron areas." Id.

On February 20, 2014, ASI informed the Corps that it "encountered a significant amount of unconfined flowing groundwater and a gravel and riprap structure not identified in the ERDC Report" and requested guidance on how to proceed. Id. ¶ 64(a). According to ASI, the Corps did not provide guidance and denied that a DSC existed. Id. ASI continued to inform the Corps that it was encountering groundwater issues, first on February 27, 2014, and then twice more in July

2014. Id. ¶¶ 64(b)–(d). On August 15, 2014, ASI again requested guidance. Id. ¶ 64(e). It claims that the Corps continued to deny that a DSC existed and did not provide direction in response to ASI's request. Id. ¶¶ 64(e), 68.

ASI alleges that its work on the apron was delayed by the unexpected water conditions and that the conditions required it to suspend its work on the south slope from August 6, 2014, to October 17, 2014. See id. ¶ 67. ASI was ultimately required to hire an additional subcontractor and change its methods on a trial and error basis in order to complete the work. Id. ¶ 71. It "requested an 86 calendar day schedule extension and associated costs in a Request for Equitable Adjustment," but the Corps denied the request. Id.

In the meantime, because of the delays caused by the unexpected groundwater conditions, the Corps withheld ASI's progress payments for July, August, and October 2014, based on insufficient progress. Id. ¶ 72. In response, ASI alleges, it notified the Corps that "it would accelerate by hiring and mobilizing an additional anchor subcontractor . . . and by working extended hours to complete the Apron work." Id. ¶ 74. It also hired "additional craft labor at higher than planned rates and was required to pay daily subsistence to most of its craft labor to maintain an adequate workforce." Id. ¶ 77. Further, ASI hired "additional on-site superintendents . . . to coordinate and schedule the increased craft labor." Id. ¶ 78.

## IV.    ASI's Claims to the Contracting Officer

On April 30, 2015, ASI formally submitted its claims to the CO. Id. ¶ 4. ASI's submission consisted of a cover letter, a "project overview," a legal memorandum, and a document entitled "Claim for Differing Site Conditions." Pl.'s Opposing Br. to Def.'s Mot. to Dismiss App. (Pl.'s App.) at PA001–041, ECF No. 7-1. In ASI's cover letter, ASI stated that it was submitting claims stemming from its prior requests for equitable adjustments. Id. at PA001. Specifically, it noted that three claims were included: 1) a claim relating to modification P0004; 2) a claim relating to concrete work; and 3) a claim relating to DSCs. Id. Particularly relevant to the issues before the Court, ASI based its DSC claims on the failed anchor tiebacks and the downstream apron groundwater conditions described above. See id. at PA004. ASI "request[ed] Contracting Officer Final Decisions." Id. at PA001.

The legal memorandum included with ASI's claim submission was broken into sections covering ASI's different legal theories of recovery: 1) differing site conditions; 2) superior knowledge; 3) constructive changes; 4) suspension of work; 5) price escalation; 6) loss of productivity; 7) extended general conditions; 8) REA assembly and legal costs; and 9) breach of the covenant of good faith and fair dealing. Id. at PA007–021.

In the submission entitled "Claim for Differing Site Conditions," ASI set forth the background of the alleged DSCs and stated that "[c]ombined with withholding of superior knowledge about the site conditions, USACE materially breached the Contract and the covenant of good faith and fair dealing." Id. at PA023; see also id. at PA023–41. It closed by "requesting $2,535,604, for the Failed Anchor tie back DSC cost damages . . . and $4,187,875, for the South slope water DSC cost damages." Id. at PA039. ASI also certified its claims. Id. at PA041.

8

On June 29, 2015, ASI submitted a supplement to its claims, providing "an expert report, documents . . . and additional video and photographs depicting flowing groundwater and its impacts." Compl. ¶ 4. In addition to providing expert testimony to support ASI's DSC claims, ASI asserted that the "failure of USACE to provide relevant Phase I site condition information to all of the Phase II bidders breached the government's obligations under the Superior Knowledge Doctrine." Pl.'s App. at PA043. "By failing to share its superior knowledge," ASI argued, "USACE breached the Contract." Id.

On July 13, 2015, ASI submitted another claim to the CO. Compl. ¶ 4. In this claim, ASI sought $680,460 for "costs incurred due to Corps-caused delays and constructive acceleration resulting in additional unanticipated subsistence and supervision costs." Id.

On February 5, 2016, the CO issued a final decision denying ASI's claims. Id.

## V.    This Action

On June 10, 2016, ASI filed its complaint in this Court. ECF No. 1. In the complaint, ASI asserts seven claims for relief:

1) A claim for an equitable adjustment based upon a Type I DSC based on the fissured rock and resulting failed tieback anchors, pursuant to FAR 52.236-2, Compl. ¶¶ 79–86;[6]

2) A claim for an equitable adjustment based upon a Type I DSC based on the unexpected south slope groundwater conditions, pursuant to FAR 52.236-2, id. ¶¶ 87–94;

3) A claim for breach of contract based upon a breach of the duty of good faith and fair dealing by the Corps in failing to provide guidance and for interfering and hindering performance by failing to provide material knowledge of site conditions, id. ¶¶ 95–101;

4) A claim for breach of contract based upon the Corps' failure to disclose superior knowledge regarding the spillway stabilization program and earlier tieback anchor problems, id. ¶¶ 102–11;

5) A claim for breach of contract based upon the Corps' failure to disclose superior knowledge of the prior downstream apron groundwater conditions, id. ¶¶ 112–21;

6) A claim for misrepresentation based upon the Corps' allegedly erroneous representations about site conditions in the solicitation and ERDC Report, id. ¶¶ 122–28; and

7) A claim for constructive acceleration based upon the Corps' failure to grant time extensions and its withholding of progress payments, id. ¶¶ 129–36.

For relief, ASI seeks 1) $6,723,479 and "a compensable time extension of 186 calendar days" for the DSCs; 2) $680,460 "for costs incurred due to Corps-caused constructive

---

[6] FAR 52.236-2 was incorporated into the contract. See Compl. ¶¶ 80, 88.

acceleration"; and 3) "additional sums to be proven at trial for breach of contract and misrepresentation," along with applicable interest, costs, and fees. Id. at 29.

On August 11, 2016, the government moved to dismiss ASI's complaint. ECF No. 6. Oral argument was held on the government's motion on December 8, 2016. See Order, ECF No. 9.

## DISCUSSION

### I. The Government's Motion to Dismiss Pursuant to RCFC 12(b)(1)

The government has moved to dismiss ASI's complaint in part pursuant to RCFC 12(b)(1). It argues that the Court lacks jurisdiction over ASI's superior knowledge and duty of good faith and fair dealing claims because ASI failed to present them to the CO. For the reasons set forth below, the government's RCFC 12(b)(1) motion is **DENIED**.

#### A.   Standards

Generally, in deciding a motion to dismiss for lack of subject matter jurisdiction, the court accepts as true all allegations in the pleadings and draws all reasonable inferences in favor of the plaintiff. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). However, if a movant disputes the factual basis for the Court's jurisdiction, the allegations in the complaint are not controlling and the Court may review evidence extrinsic to the pleadings. Cedars-Sinai Med. Ctr. v. Watkins, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993). Upon review of the extrinsic evidence, the court "must satisfy itself that there is a factual basis for it to exercise jurisdiction." 3M Co. v. Avery Dennison Corp., 673 F.3d 1372, 1378 (Fed. Cir. 2012).

The plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence. Brandt v. United States, 710 F.3d 1369, 1373 (Fed. Cir. 2013); see also Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). If the court does not have subject matter jurisdiction, it must dismiss the claim. RCFC 12(h)(3).

#### B.   Application of Standards

The Tucker Act grants the United States Court of Federal Claims the power "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). Further, the Court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41 [i.e., the CDA]." Id. § 1491(a)(2).[7]

---

[7] The CDA applies to any express or implied contract made by an executive agency for 1) the procurement of property, other than real property in being; 2) the procurement of services; 3) the procurement of construction, alteration, repair, or maintenance of real property; or 4) the disposal of personal property. 41 U.S.C. § 7102(a)(3).

Under the CDA, when a contractor has a claim against the government, the "claim . . . shall be submitted to the contracting officer for a decision." Id. § 7103(a)(1). This must be done in writing. Id. § 7103(a)(2). Further, "[e]ach claim . . . shall be the subject of a written decision by the contracting officer." Id. § 7103(a)(3).

Once a contractor submits a claim to the CO and receives a written decision, it may bring an action directly in the Court of Federal Claims "in lieu of appealing the decision of a contracting officer . . . to an agency board." Id. § 7104(b)(1). The contractor must do so within twelve months from "the date of receipt of a contracting officer's decision." Id. § 7104(b)(3).

Compliance with the dispute resolution procedures set forth in the CDA is a prerequisite to the Court's exercise of jurisdiction over claims covered by that act. See England v. The Swanson Grp., Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004) (observing that "jurisdiction over an appeal of a [CO's] decision is lacking" unless the contractor has first presented its claim to the CO for decision). Thus, for the Court to have subject matter jurisdiction over a CDA dispute, there must be "both a valid claim and a [CO's] final decision on that claim." M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citing James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996)).

In this case, the government has moved to dismiss ASI's third, fourth, and fifth claims for relief for lack of subject matter jurisdiction on the grounds that ASI allegedly failed to present those claims to the CO. Def.'s Mot. to Dismiss (Def.'s Mot.) at 10–13, 15–16. The government's argument, however, clearly lacks merit because the claims it seeks to have dismissed were presented in some detail in ASI's April 30, 2015 letter and its June 29, 2015 supplement (which were presumably available to the government when it filed its motion to dismiss).

Thus, ASI's third claim for relief, which is based upon a breach of the duty of good faith and fair dealing, see Compl. ¶¶ 95–101, was explicitly raised in the legal memorandum that ASI submitted to the CO, Pl.'s App. at PA019–21. That memorandum, in fact, included a section specifically entitled "Covenant of Good Faith and Fair Dealing," id. at PA019, which laid out the legal basis for ASI's claim and stated that "[g]iven the actions and inactions of USACE on this Project . . . a breach of contract is established." Id. at PA021; see also id. at PA014 (passage in legal memorandum stating that "USACE had directly pertinent and specific knowledge of differing site conditions . . . and failed to share [it]," and that the Corps' "actions not only breach the contract based on superior knowledge, they also constitute a breach of the covenant of good faith and fair dealing").

ASI's fourth and fifth claims for relief are both breach of contract claims based upon the failure to disclose superior knowledge, relating to the tieback anchor problems and the downstream apron, respectively. Compl. ¶¶ 111–21. These claims were also explicitly raised in the memorandum ASI submitted to the CO, in a section entitled "Superior Knowledge." Pl.'s App. at PA013. In that section, ASI set out the legal framework for superior knowledge claims, stated that "USACE withh[e]ld [its] superior knowledge from ASI at the time of Contract formation," and argued that doing so "breach[ed] the contract based on superior knowledge." Id. at PA014. Further, in the supplemental claim letter ASI submitted in June 2015, it asserted its superior knowledge claims again. Specifically, ASI alleged that the "failure of USACE to provide relevant Phase I site condition information to all of the Phase II bidders breached the

government's obligations under the Superior Knowledge Doctrine" and that "[b]y failing to share its superior knowledge . . . USACE breached the Contract." Id. at PA043.

In short, there is no merit to the government's motion to dismiss ASI's third, fourth, and fifth claims for relief on jurisdictional grounds. The motion is, accordingly, **DENIED**.

## II.     The Government's Motion to Dismiss Pursuant to RCFC 12(b)(6)

The government has moved to dismiss all seven of ASI's contract claims pursuant to RCFC 12(b)(6). For the reasons set forth below, the government's motion is **DENIED** in its entirety.

### A.     Standards

When considering a motion to dismiss for failure to state a claim, pursuant to RCFC 12(b)(6), the court accepts as true the complaint's factual allegations and construes them in the light most favorable to the plaintiff. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). The court also draws all reasonable inferences in favor of the non-moving party. Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001). So construed, the plaintiff's allegations must "raise [the] right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). While a plaintiff is not required to include "detailed factual allegations" in order to survive a motion to dismiss for failure to state a claim, it must supply more than conclusory allegations or a recitation of the elements of a cause of action. Iqbal, 556 U.S. at 677–78 (internal quotations and citations omitted).

### B.     Application

#### 1.     Differing Site Condition Claims

In order to state a Type I differing site condition claim, a plaintiff must plausibly allege: 1) that a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions; 2) that the actual site conditions were not reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents (i.e., that the contractor reasonably relied on the representations); 3) that the contractor in fact relied upon the contract representations; and 4) that the contractor encountered conditions that differed materially from those represented and suffered damages as a result. CCI, Inc. v. McHugh, 608 F. App'x 937, 939–40 (Fed. Cir. 2015); Int'l Tech. Corp., 523 F.3d at 1348–49; Renda Marine, Inc. v. United States, 509 F.3d 1372, 1376 (Fed. Cir. 2007).

In this case, the government urges dismissal of ASI's DSC claims under RCFC 12(b)(6) on the grounds that the contract documents to which ASI refers in its complaint do not affirmatively represent: 1) that the rock into which ASI was required to install tieback anchors was not pervasively fissured; and 2) that the water table at the site of the apron was perched and without active water flowing into it. See Def.'s Mot. at 7–10. It also argues that certain caveats and disclaimers contained in the contract documents precluded ASI from relying upon representations in the ERDC Report as a basis for its DSC claims.

The government's arguments are unpersuasive. While the interpretation of a contract involves a question of law,[8] "the question of what meaning should be given by a court to the words of the contract[] may sometimes involve questions of material fact and not present a pure question of law." Travelers Cas. & Sur. Co. of Am. v. United States, 75 Fed. Cl. 696, 703 (2007) (citing Beta Sys., Inc. v. United States, 838 F.2d 1179, 1183 (Fed. Cir. 1988)).

In this case, the primary contract document upon which ASI relies for its DSC claims is the 212-page ERDC Report entitled "Summary and Interpretation of Select Laboratory and Field Test Results in Support of a Temporary Shoring System at the Weir of the Canton Dam Auxiliary Spillway." The ERDC Report contains highly technical descriptions of site conditions and numerous tables, graphs, and drawings that present the results of geophysical tests conducted by the Corps and various contractors. Interpreting the text and the test results set forth in the ERDC Report manifestly involves more than legal analysis; as described below, it requires factual determinations for which expert testimony would likely be needed. Such determinations cannot be made in the context of a motion to dismiss. See Extreme Coatings, Inc. v. United States, 109 Fed. Cl. 450, 459 (2013) (declining to determine in the context of a motion to dismiss whether plaintiff reasonably interpreted a contract as making representations as to the water levels that would be encountered at a dam).

Thus, ASI alleges that the ERDC Report represented that fissures in the rock behind the diaphragm walls were "closed and discontinuous." Compl. ¶ 45. It claims that it encountered pervasively fissured rock which "differed materially from [the conditions] indicated in the Contract." Id. ¶¶ 46–47. ASI cites several passages from the ERDC Report as support for its interpretation. For example, it notes that the ERDC Report stated that the "fine-grained nature of the clay-shale would suggest the upper Dog Creek is an impermeable rock," and that "[s]licken-sided, tightly closed fractures were encountered near the contact between the Rush Springs and Dog Creek Shale." Id. ¶ 45. In addition, ASI points out that the ERDC Report stated that it was "speculated" that "open joints or other types of open discontinuities would not remain open in the Dog Creek" because of "the weight of the overburden and rock combined with the soft nature of the rock." Id. Further, ASI notes that the ERDC Report referred to a Corps study conducted in 2010 which drew the conclusion that there was "no evidence that the zones/pockets/seams [in the rock] are continuous." See id.

The government argues that the statements in the ERDC Report which ASI cites in its complaint employ words such as "speculate" and "suggest," which are not sufficiently "affirmative" or "unqualified" to serve as the basis for a DSC claim. See Def.'s Mot. at 7–10. It contends that the statements "merely provided qualified speculation based on the limited data available." Id. at 7. In addition, the government cites the following clause, contained in the contract's "soil and rock anchors" specification, which it claims "expressly precludes ASI from asserting a differing site condition claim based on rock fissures":

---

[8] E.g., P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 916–17 (Fed. Cir. 1984) (determining whether contract contains any indications regarding site conditions "is a matter of contract interpretation and thus presents a question of law which may be decided by th[e] court for itself").

A foundation investigation has been made at the site by the Government and data is presented on the foundation exploration drawings. Subsurface soil data logs are shown on the drawings. While the foundation information is representative of subsurface conditions at the respective locations, local variations in the characteristics of the subsurface materials may be anticipated. Local variations which may be encountered include, but are not limited to, classification and thickness of rock strata, fractures, and other discontinuities in the rock structure, and variation in the soil classifications. Such variations will not be considered as differing materially within the purview of the CONTRACT CLAUSES, paragraph Differing Site Conditions.

Def.'s Suppl. App. at DSA009; see also Def.'s Reply in Supp. of Its Mot. to Dismiss (Def.'s Reply) at 7–8.

The government's arguments are unpersuasive. The Court does not understand ASI to be relying upon particular passages in the ERDC Report in isolation as the basis for its allegation that the ERDC Report represented that the rock behind the diaphragm walls was not pervasively fissured. Rather, ASI alleges that the ERDC Report as a whole, including the extensive test result data it contains, supplied such representations. See, e.g., Def.'s Mot. App. at DA132 (statement in the ERDC Report that "no evidence of cavities or voids was reported in the early drilling program or subsequent drilling programs in the past 25 years into the foundation").

Further, at this point, the Court cannot determine whether ASI's claim that the rock behind the diaphragm walls was pervasively fissured can reasonably be categorized as a "local variation" subject to the exculpatory language in the contract upon which the government relies. As with the interpretation of the ERDC Report, further explanation and development of the record is required to establish where the "foundation investigation" referenced in the clause was conducted, what it showed, and how it relates to ASI's DSC claims.

Similarly, the Court understands ASI's claim that the groundwater conditions it encountered were materially different from the conditions described in the contract to be based on the consideration of the contract documents as a whole. Thus, ASI alleges that the ERDC Report represented that the groundwater at the apron site was "perched." Compl. ¶ 59. ASI further alleges that a reasonable contractor reading the ERDC Report would conclude that "the groundwater is recharged from the north only and [that] the breccia is generally dry." Id. ¶ 60; see also Pl.'s Opp. Br. to Def.'s Mot. at 16–17. It contends that in light of the "perched water table noted in the ERDC Report," it concluded that the conditions it would encounter "would have involved minimal water drainage so excavation could be performed in the dry." Compl. ¶ 59.

The government again takes issue with ASI's interpretation of the ERDC report, both as to whether the ERDC Report can be read as confirming that the groundwater in the apron area was perched and whether it showed that any flowing water had its source north of that area. It cites what it characterizes as "qualifications" and "caveats" in the ERDC Report's groundwater descriptions. Def.'s Mot. at 8–10. These include, among others, statements that "[a]dditional

groundwater studies should be conducted to confirm whether the Dog Creek Shale has the capacity to transmit ground water in the vicinity of the weir excavation," Def.'s Mot. at 9 (quoting Def.'s Mot. App. at DA079), and that "the pathways for transmission of water along bedding planes or open joints in the Dog Creek Shale ha[ve] not been described," Def.'s Reply at 5 (quoting Def.'s Mot. App. at DA078).

Once again, the government's arguments are premature. The Court lacks the technical expertise to determine whether either of the statements regarding groundwater conditions that the government cites in fact undermines ASI's interpretation of the ERDC Report. As with ASI's claims regarding fissured rock, the Court declines to interpret the meaning of the ERDC Report's discussion of groundwater conditions in the context of a motion to dismiss. Accepting as true all statements of fact in ASI's complaint, and drawing all inferences in its favor, the Court cannot conclude at this juncture that ASI's interpretation of the ERDC Report's technical provisions is not plausible.

Finally, the Court also declines to dismiss ASI's DSC claims based on certain general language regarding site conditions that is included in the contract documents. In particular, the government cites Section 02 00 00 of the contract, which states that "variations may exist in the subsurface between boring locations" and that contractors should "review the geotechnical information provided, assess if any additional subsurface information is required, and develop a plan . . . to . . . perform laboratory or field testing, and install and monitor[] piezometers." Def.'s Mot. at 7–8 (quoting Def.'s Mot. App. at DA010).

It is well-established that, assuming contract documents make affirmative representations about site conditions, "broad exculpatory clauses . . . do not relieve the defendant of liability for changed conditions." United Contractors v. United States, 177 Ct. Cl. 151, 165–66 (1966) (internal quotation omitted); see also Woodcrest Constr. Co. v. United States, 408 F.2d 406, 410 (Ct. Cl. 1969) ("[G]eneral portions of the specifications should not lightly be read to override the Changed Conditions clause."). Further, to the extent that the contract documents suggest—as they appear to do here—that additional testing should be performed "by the contractor" after a contract is awarded, "the natural meaning" of such a clause is that, "while [a contractor] would investigate conditions once the work began, it did not bear the risk of significant errors in the pre-contract assertions by the government about the subsurface site conditions." Metcalf Constr. Co. v. United States, 742 F.3d 984, 996 (Fed. Cir. 2014).

Accordingly the exculpatory clause to which the government refers does not override the DSC clause. The government's motion to dismiss with respect to ASI's DSC claims is **DENIED**.[9]

---

[9] In light of the Court's denial of the government's motion to dismiss ASI's DSC claims, the Court will also deny the government's motion to dismiss ASI's seventh claim for relief based on constructive acceleration, as the government sought dismissal of that claim on the grounds that it was "wholly dependent" upon the DSC claims. Def.'s Mot. at 17.

### 2.    Superior Knowledge Claims

The government also argues that ASI's fourth and fifth claims for relief, for breach of contract based upon superior knowledge, should similarly be dismissed. This contention also lacks merit.

To state a breach of contract claim based upon the superior knowledge doctrine, a contractor must plausibly allege that: 1) it undertook to perform without vital knowledge of a fact that affects performance costs or direction; 2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; 3) any contract specification supplied misled the contractor, or did not put it on notice to inquire; and 4) the government failed to provide the relevant information. GAF Corp. v. United States, 932 F.2d 947, 949 (Fed. Cir. 1991) (citing Lopez v. A.C. & S. Inc., 858 F.2d 712, 717 (Fed. Cir. 1988)); see also Scott Timber Co. v. United States, 692 F.3d 1365, 1372–73 (Fed. Cir. 2012).

As discussed above, ASI prepared its bid and began work based on the solicitation and the ERDC Report. Compl. ¶¶ 16–17. ASI alleges that the ERDC Report and the contract documents represented that the rock fissures were closed and discontinuous and that the clay-shale suggested impermeable rock. Id. ¶ 45. Further, ASI alleges that the documents represented that only perched water would be found and the breccia would be dry, thus allowing for excavation in the dry without significant dewatering. Id. ¶¶ 59–60. It also alleges that when asked during the Phase II bidding process about unforeseen conditions during Phase I, the Corps did not provide the Phase I groundwater information. Id. ¶ 26. As a result, ASI claims, when it prepared its proposal and when it started work, it was unaware of the important facts that pervasively fissured rock and flowing groundwater were present and would affect the time and cost of performance. See id. ¶¶ 48–49, 51, 55, 63–64.

The Court finds unpersuasive the government's argument that ASI's superior knowledge claims should be dismissed because it has not alleged facts sufficient to show that the contract specifications supplied to it were misleading. Def.'s Mot. at 13–14. First, the government misstates the relevant element of a superior knowledge claim; to survive a motion to dismiss, ASI need not allege facts sufficient to show that the contract specifications misled it. Rather, it is sufficient that it allege facts that show that the specifications "did not put it on notice to inquire" about the conditions at issue. GAF Corp., 932 F.2d at 949. But, more to the point, the question of what information was supplied to ASI in the contract documents, and whether it was misleading, again depends upon how the ERDC Report and its findings are interpreted. Thus, for the same reasons that the Court found it inappropriate to address the ERDC Report's interpretation in the context of a motion to dismiss the DSC claims, it also declines to do so in considering whether to dismiss ASI's superior knowledge claims.

The government's motion to dismiss for failure to state a claim as to ASI's fourth and fifth claims for relief is, accordingly, **DENIED**.

### 3.    Duty of Good Faith and Fair Dealing Claim

The government argues that the Court should dismiss ASI's third claim for relief, which alleges that the Corps violated the implied duty of good faith and fair dealing, because that claim

is "expressly redundant to [ASI's] other claims." Def.'s Mot. at 15 (citing <u>CFS Int'l Capital Corp. v. United States</u>, 118 Fed. Cl. 694, 701 (2014) (applying New York law, court held that "[i]n order to avoid redundant claims, a plaintiff 'may maintain a claim for breach of the implied covenant [of good faith and fair dealing] only if the claim is based on allegations different from the allegations underlying the accompanying breach of contract claim'" (quoting <u>Fleisher v. Phoenix Life Ins. Co.</u>, 858 F. Supp. 2d 290, 299 (S.D.N.Y. 2012)))).

The Court declines to determine at this time whether and to what extent ASI's good faith and fair dealing claim is redundant of its other claims. To be sure, the allegations set forth in the complaint in support of the claim appear to overlap substantially with those that form the basis for ASI's DSC, superior knowledge, and constructive acceleration claims. <u>See</u> Compl. ¶ 100. Nonetheless, ASI argues that its good faith and fair dealing claim relies upon additional facts, such as the failure of the Corps "to provide guidance and direction to ASI's performance." <u>Id.</u> ¶ 98.

On a motion to dismiss for failure to state a claim, the Court must construe the complaint in the light most favorable to the non-moving party and draw all reasonable inferences in favor of ASI. Further, it is not apparent to the Court that the government would be prejudiced if a claim which it contends is redundant is not dismissed at this point in the proceedings. Accordingly, the government's motion to dismiss ASI's third claim for relief is **DENIED**.

### 4.    Misrepresentation Claim

In order to recover on a claim for misrepresentation, the contractor must show that the government made "an erroneous representation of a material fact that the contractor honestly and reasonably relied upon to [its] detriment." <u>T. Brown Constructors, Inc. v. Pena</u>, 132 F.3d 724, 728–29 (Fed. Cir. 1997). The government argues for dismissal of ASI's sixth claim for relief, based on misrepresentation, on the grounds that the contract documents did not contain any erroneous representations of site conditions and that whatever representations they made were qualified by disclaimers. Def.'s Mot. at 16–17.

The Court declines to dismiss the misrepresentation claim on these bases. As with ASI's DSC and superior knowledge claims, the government's argument would require the Court to interpret the technical information contained in the ERDC report, a fact-finding exercise that is not appropriate in the context of a motion to dismiss where the Court must accept as true the allegations in ASI's complaint.

The government's motion to dismiss ASI's misrepresentation claim is, accordingly, **DENIED**.[10]

---

[10] The Court notes that in <u>Johnson & Sons Erectors Co. v. United States</u>, 231 Ct. Cl. 753, 759 (1982), the Court of Claims held that "a claim remediable under a contract clause is not a breach and cannot be remediable as a breach." It has been suggested that, in light of this authority, "to the extent that the Differing Site Conditions clause is applicable, breach of contract claims for misrepresentation . . . are precluded." John Cibinic, Jr., James F. Nagle, & Ralph C. Nash, Jr., <u>Administration of Government Contracts</u> 466 (5th ed. 2016). The government, however, did not

## CONCLUSION

For the reasons set forth above, the government's motion to dismiss is **DENIED**.


**IT IS SO ORDERED.**


<div style="margin-left: 50%;">

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge

</div>

---

make this argument as a basis for its motion to dismiss ASI's misrepresentation claim and the parties did not brief the issue. Accordingly, the Court sees no reason to address it at this time.